A-580-809<br>
Remand<br>
Slip Op. 23-112<br>
POR:  11/1/2019 – 10/31/2020<br>
**Public Document**<br>
E&C/OI:  JW

*Wheatland Tube v. United States, et al.,*
*Court No. 22-00160, Slip Op. 23-112 (CIT June 9, 2023)*
*Circular Welded Non-Alloy Steel Pipe from Republic of Korea*

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *Wheatland Tube v. United States et. al.*, Court No. 22-00160, Slip Op 23-112 (CIT June 9, 2023) (*Remand Order*).  This action arises out of the final results in the antidumping duty (AD) administrative review of circular welded non-alloy steel pipe (CWP) from the Republic of Korea (Korea).[1]  The Court remanded to Commerce its decision to grant a constructed export price (CEP) offset to the respondents in the final results of Commerce's 2019-2020 administrative review in light of Commerce's statutory obligations pursuant to section 782(d) of the Tariff Act of 1930 (the Act).  On remand, Commerce is denying the CEP offset to the mandatory respondents, Husteel Co. Ltd. (Husteel) and Hyundai Steel Company (Hyundai).

**II.   BACKGROUND**

On May 4, 2022, Commerce published the *Final Results* in the *Federal Register*, in which it found the two mandatory respondents, Husteel and Hyundai, made sales of CWP from Korea

---

[1] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 26343 (May 4, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

at less than normal value during the period of review (POR), November 1, 2019, through October 31, 2020, and thus, determined weighted-average dumping margins of 4.07 percent for Husteel, 1.97 percent for Hyundai, and 3.21 percent for the non-selected respondents.  In the *Final Results*, Commerce granted a CEP offset to each mandatory respondent.[2]

In the response to section A of the initial questionnaire, Husteel provided a selling functions chart with assigned levels of intensities, along with documentation to support that it has different selling functions in its respective trade channels in the home and U.S. markets to substantiate its request for a CEP offset.[3]  Similarly, Hyundai provided a selling functions chart with levels of intensities based on the number of employees staffed for each sales activity category or the existence of a sales activity, a quantitative analysis table, and documentation supporting the claimed number of salespersons for each channel of distribution in the home market and U.S. market.[4]

Following receipt of the questionnaire responses, Commerce issued a supplemental questionnaire to Husteel requesting clarifying information regarding its selling functions chart.[5] Specifically, Commerce asked that Husteel provide a quantitative analysis substantiating its assigned intensities of each selling function, the impact of POR sales expenses under these varying intensities on price comparability, and the extent of variation in indirect selling expenses

---

[2] *See* 19 CFR 351.412(f).  To the extent practicable, Commerce attempts to base normal value on sales made at the same level of trade as the export price or constructed export price or adjust for the differences in levels of trade. Where this is not possible, the law provides for an adjustment to normal value to account for differences in level of trade when:  (1) U.S. price is a constructed export price; (2) normal value is determined at a more advanced level of trade than the level of trade of the constructed export price; and  (3) the data available do not provide an appropriate basis for determining whether differences in levels of trade affect price comparability and quantifying the amount of a level of trade adjustment.  This adjustment takes the form of a deduction from normal value of the amount of indirect selling expenses incurred in the foreign market. The amount of this deduction may not exceed (*i.e.*, it is capped by) the amount of indirect selling expenses deducted in calculating constructed export price.
[3] *See* Husteel's Letter, "Section A Questionnaire Response" dated March 23, 2021 (Husteel Section AQR), at A-15 and at Exhibits A-10-A and A-10-B.
[4] *See* Hyundai's Letter, "Section A Questionnaire Response," dated March 23, 2021 (Hyundai Section AQR), at A-28 and at Exhibit A-13-A.
[5] *See* Commerce's Letter, "Supplemental Questionnaire," dated October 15, 2021, at 3.

2

(ISE) by claimed level of trade (LOT). However, Commerce did not issue a similar supplemental questionnaire to Hyundai requesting additional information to support its CEP offset claim. In its supplemental questionnaire response,[6] Husteel reported that it had relied on the number of personnel allotted per selling activity to determine selling function intensities, similar to Hyundai Steel's original section A response.

In the *Preliminary Results*,[7] Commerce found that both Husteel and Hyundai provided sufficient documentation and quantitative analysis to substantiate their selling activity intensities, and accordingly, granted CEP offset adjustments to both respondents. In its case brief, Wheatland Tube (Wheatland or the petitioner) argued that neither mandatory respondent provided the necessary quantitative analysis needed for Commerce to grant a CEP offset.[8] In the *Final Results*, although Commerce found that neither Husteel nor Hyundai provided an adequate quantitative analysis to support their claims for a CEP offset, Commerce continued to grant a CEP offset to both respondents because Commerce failed to provide them with an opportunity to remedy deficiencies in their quantitative analysis supporting the claim for a CEP offset. On June 9, 2023, the Court remanded the *Final Results* to Commerce, giving parties the opportunity to "remedy or explain" any deficiencies in their response to Commerce.[9]

---

[6] *See* Husteel's Letter, "Questions 3, 4, and 11 Supplemental Questionnaire Response," dated November 8, 2021, at 7-8.
[7] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 FR 69225 (December 7, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[8] *See* Petitioner's Letter, "Case Brief," dated January 7, 2022.
[9] *See Remand Order* at 7.

**III.     ANALYSIS**

In the *Remand Order*, the Court held that Commerce should "provide the mandatory respondents with: (1) notice of the 'nature' of any deficiencies that Commerce identified in their respective submissions; and (2) … an opportunity to remedy or explain the deficienc{ies}."[10] In accordance with the Court's instructions, for the draft results of remand redetermination,[11] Commerce issued a supplemental questionnaire to each respondent identifying deficiencies in their respective submissions and providing an opportunity to remedy the deficiencies found in their original questionnaire responses.[12] After receiving timely questionnaire responses from both respondents,[13] Commerce finds that neither mandatory respondent satisfied the requirement under 19 CFR 351.412(f)(ii) in that "{n}ormal value is determined at a more advanced LOT than the LOT of the CEP," and therefore, Commerce has not granted a CEP offset to either mandatory respondent under 19 CFR 351.412(f).

Consistent with the Draft Results of Redetermination, Commerce finds that the record does not support either mandatory respondent's claim that its home market and U.S. sales were made at two different LOTs.[14] Commerce examined the information submitted by each respondent during the administrative review and in this remand proceeding regarding the marketing stages involved in making its reported home market and U.S. sales, including a description of the selling activities performed by each respondent for the channels of

---

[10] *See Remand Order* at 7.
[11] *See* Draft Results of Redetermination Pursuant to Court Remand, *Wheatland Tube v. United States, et al*. Court No. 22-00160, Slip Op. 23-112 (CIT June 9, 2023), dated September 29, 2023 (Draft Results of Redetermination).
[12] *See* Commerce's Letters, "Supplemental Questionnaire," dated August 24, 2023.
[13] *See* Husteel's Letter, "Remand Supplemental Questionnaire Response," dated September 7, 2023 (Husteel Remand SQR); and Hyundai's Letter, "Remand Supplemental Questionnaire Response," dated September 7, 2023 (Hyundai Remand SQR).
[14] *See* Draft Results of Redetermination.

4

distribution.[15] Commerce's methodology requires a quantitative analysis of selling expenses in each sales channel, and that the respondent assign a level of intensity based on this quantitative analysis in a selling functions chart.[16] Both respondents provided a quantitative analysis to demonstrate the differences between their claimed levels of intensities for the selling activities undertaken in the home market versus the U.S.[17] However, Commerce extended these analyses to also include a per-unit analysis of the claimed selling function intensities based on the sales volume in each channel, negating the effects of market size differences on reported intensity levels. Selling function intensity depends on that function's associated ISEs, and thus, Commerce normalizes each reported intensity by dividing it by quantity sold, for each market respectively. Commerce has conducted per-unit analyses regarding CEP offset in past cases.[18] Further, Commerce's remand supplemental questionnaires requested a "quantitative analysis" demonstrating the impact of expenses for POR sales made at different claimed LOTs on price comparability.[19] Our extended analysis yields a per-unit selling expense intensity which indicates that significantly more effort is applied by both respondents on each unit of sale to its U.S. affiliate than for each unit sold in the home market for almost every selling function.[20]

---

[15] *See* Husteel Section AQR at Exhibit A-10; Husteel Remand SQR at Exhibit REM-1; Hyundai Section AQR at Exhibit A-13-A; and Hyundai Remand SQR at Exhibit RS-1.
[16] *See, e.g.*, *4th Tier Cigarettes from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair al Negative Determination of Critical Circumstances*, 85 FR 79994 (December 11, 2020), and accompanying IDM at 30.
[17] *See* Husteel Remand SQR at Exhibit REM-4; *see also* Hyundai Remand SQR at Exhibit RS-5.
[18] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2021–2022*, 88 FR 38489 (June 13, 2023), and accompanying PDM at 15, unchanged in *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021–2022*, 88 FR 55665 (August 16, 2023); *see also Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2019–2020*, 86 FR 33653 (June 25, 2021), and accompanying PDM at 9, unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 86 FR 56889 (October 13, 2021).
[19] *See* Husteel Remand SQR at 3; *see also* Hyundai Remand SQR at RS-5.
[20] *See* Memoranda, "Draft Remand Results Calculation for Husteel Co., Ltd.," dated September 29, 2023; and "Draft Remand Results Calculation for Hyundai Steel Company," dated September 29, 2023 (Hyundai Draft Remand Calculation Memorandum).

After considering comments in response to the Draft Results of Redetermination, we continue to determine that the mandatory respondents have not provided the quantitative analysis required to find home market sales at a different LOT and more advanced stage of distribution than the CEP LOT.  Section 773(a)(7)(B) of the Act provides that a CEP offset may only be granted "when normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price."  In this case, our per-unit analysis establishes that the home market LOT is not at a more advanced stage of distribution than the LOT of the CEP LOT of either respondent.  Furthermore, neither respondent provided sufficient evidence from their books and records linking expenses to specific selling activities.  Accordingly, pursuant to 19 CFR 351.412(f)(ii) and section 773(a)(7)(B) of the Act, Commerce determines that a CEP offset is not warranted.

### IV.   INTERESTED PARTY COMMENTS

On September 29, 2023, Commerce released its Draft Results of Redetermination and invited interested parties to comment.[21]  On October 11, 2023, we received comments from Wheatland, Husteel, Hyundai, and NEXTEEL Co., Ltd. (NEXTEEL).[22]  These comments are summarized below.

---

[21] *See* Draft Results of Redetermination.
[22] *See* Wheatland's Letter, "Petitioner's Comments on Draft Results of Redetermination," dated October 11, 2023 (Wheatland Comments); *see also* Husteel's Letter, "Husteel's Comments on Draft Remand Results," dated October 11, 2023 (Husteel Comments); Hyundai's Letter, "Comments on Draft Remand Results," dated October 11, 2023 (Hyundai Comments); and NEXTEEL's Letter, "Comments on Draft Remand Redetermination," dated October 11, 2023 (NEXTEEL Comments).  We note that NEXTEEL's comments consisted of supporting and incorporating any comments from Hyundai and Husteel.

**Comment 1:  Hyundai's CEP Offset**

*Wheatland's Comments*[23]

- Hyundai's analysis does not discuss whether the claimed difference in LOTs affect price comparability, even after Commerce requested this information specifically in the remand supplemental questionnaire.[24]  Hyundai also does not show price differences exist or relate them to the different LOTs.

- The total ISEs in Hyundai's selling function groups do not differ by the ratio of home to U.S. market size.  In many cases, home market ISEs are less than U.S. ISEs by factors far from the difference in market size.

- Hyundai does not relate specific costs to specific sales activities.  Incredibly broad cost categories are used repeatedly in analyzing entirely different selling functions.  The methodology does not inform the intensity of actual selling activities, just the overall cost category.

- Hyundai admits to allocating expenses from some of these general categories to the U.S. and home markets based on the number of salespeople in each market.  Sales force size can be driven by factors external to differences in sales activity, such as differences in market volume.  Hyundai's analysis, thus, does not support the claimed differences in selling activities.

- Commerce has rejected Hyundai's LOT analyses in past cases when they fail to connect broad categories, such as size of sales force or sales volume, to "the specific, individual

---

[23] *See* Wheatland Comments at 7-12.
[24] *See* Hyundai's Remand SQR at RS-5.

7

- selling functions (*e.g.*, sales/marketing support and inventory maintenance), rather than to other functions unrelated to its selling activities."[25]

- Hyundai's analysis is qualitative and subjective, as Hyundai fails to justify how certain costs are related to their claimed associated selling activities. Furthermore, the intensities reported for certain functions are also never justified.

*Hyundai's Comments*[26]

- Section 773(a)(7)(B) of the Act, which governs CEP offsets, does not require a quantitative analysis, and Commerce has historically relied on qualitative evidence in determining LOTs, such as a "simple" selling functions chart of the kind Hyundai included in its responses.[27]

- In the *Preliminary Results*, Commerce found that Hyundai's qualitative analysis adequately supported Hyundai's claims regarding level of intensity.[28]

- In initial and supplemental questionnaires issued during this remand, Commerce failed to provide clear and explicit guidelines for a quantitative analysis. In the absence of this guidance, Hyundai used its best judgement and understanding to improve its quantitative analysis.

- Commerce's flawed per-unit selling expense analysis uses reported selling function intensities that derive from an expense category which tracks total company-wide export sales expenses, not U.S. export sales.

---

[25] *See* Wheatland Comments at 10 (citing *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 FR 60989 (October 7, 2022), and accompanying IDM at 16, unchanged in *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 FR 20128 (April 5, 2023).
[26] *See* Hyundai's Comments.
[27] *Id.* at 3.
[28] *Id*. (citing *Preliminary Results* PDM at 22-23).

- Therefore, these reported intensities must be divided by total company-wide export sales volume, rather than just by U.S. sales market volume of subject merchandise, as the erroneous denominator inaccurately inflates the ratio of CEP to home market per-unit intensities for numerous selling functions.

**Commerce's Position:** While Hyundai is correct that Commerce initially granted a CEP offset in the *Preliminary Results*, it fails to mention that Commerce specifically stated in the *Final Results* that neither Hyundai nor Husteel "provided an adequate quantitative analysis" substantiating different levels of intensity.[29]  Commerce only granted a CEP offset in the *Final Results* on a procedural failure to provide Hyundai and Husteel the opportunity to remedy deficiencies in their quantitative analysis, a requirement pursuant to section 782(d) of the Act.  Commerce qualifies this decision by warning respondents that going forward, Commerce will "continue to examine the issue of quantitative support for such offsets in future reviews of this proceeding,"[30] indicating that this decision cannot be used as precedent of affirmative quantitative substantiation in future decisions regarding CEP offset.  Although Commerce in certain past reviews had not required that a quantitative analysis be provided, Commerce has since repeatedly informed respondents of its change in practice regarding the necessity of the quantitative analysis.  In the previous administrative review of this proceeding covering the 2018-2019 period, Commerce specifically informed parties that "in future administrative reviews a more detailed and robust quantitative analysis of {selling functions} will be required for us to consider a CEP offset."[31]

---

[29] *See Final Results* IDM at 13.
[30] *Id.* at 14.
[31] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 53631 (September 28, 2021), and accompanying IDM Comment 3.

Hyundai reported a single channel of distribution in the home market and two channels of distribution in the United States.[32] Hyundai reported that it performed selling functions in all channels of distributions under each of these sales activity categories: (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales related administrative activities.[33] Hyundai based its quantitative method on the number of employees to determine intensities of the different selling functions. For all channels of trade, Hyundai reported intensities for these functions on a scale from zero to 10.[34] Section 351.401(b)(1) of Commerce's regulations states that "{t}he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment." We find there are a number of significant faults with Hyundai's quantitative analysis, and thus, we have not granted a CEP offset for Hyundai.

First, Hyundai's analysis, based on the number of employees, does not consider differences in the sizes between the two markets. Hyundai states that its "home market itself is nearly 125 times greater than the U.S. market … ."[35] To examine only total expenses or the number of employees does not provide the analysis necessary to determine that the home market operates on a different and more advanced stage of distribution than its U.S. sales, as required by section 773(a)(7)(B) of the Act. Hyundai was specifically instructed to provide documentation demonstrating the selling functions undertaken in the different channels of distribution and supporting the reported selling function intensities.[36] In order to properly compare the different

---

[32] *See* Hyundai Section AQR at A-23 and A-24.
[33] *Id*.
[34] *Id.* Exhibit A-13-A.
[35] *See* Hyundai's Comments at RS-9.
[36] *See* Hyundai's Remand SQR.

markets, it is necessary to account for and eliminate the distortion created by the differences in the sizes between the markets. Commerce conducted a per-unit analysis based on Hyundai's data, quantitative analysis, and intensity methodology to establish an accurate comparison between the different channels of distribution.[37] We agree with Hyundai's comments that Commerce's analysis did not consider that the level of intensity for many of the selling activities was based on company-wide total exports and not specific to the U.S. market. However, we disagree that the proper analysis would be to compare Hyundai's domestic market to its total export market. The determination of whether to grant a CEP offset is based on a comparison between the domestic market and the U.S. CEP sales; including expenses based on other export markets would be distortive and not provide an appropriate comparison. This further highlights another major fault with Hyundai's provided quantitative analysis – Hyundai did not present supporting evidence that tied expenses to specific sales activities and could have possibly justified the level of intensity reported in the U.S. market.

Hyundai's quantitative analysis provided the number of employees within broad divisions to calculate the intensity of these selling functions.[38] However, Hyundai did not provide any evidence from its books and records that ties the number of employees to specific individual selling functions in the different channels of distribution.[39] Furthermore, we note that for certain ISE categories, Hyundai used the same cost category as the basis of intensity for a variety of selling functions and provided no information on the actual selling activities or how the intensity was determined, beyond overall wage cost.[40] Thus, Hyundai failed to provide the quantitative

---

[37] *See* Draft Results of Redetermination; and Hyundai Draft Remand Calculation Memorandum.
[38] *Id*.
[39] *Id*.
[40] *Id*.

data and corresponding support necessary to determine whether the U.S. market operates at a higher or lower level of development than the domestic market.

We reviewed the evidence provided by Hyundai: (1) the selling functions reported in each market; (2) the intensity level reported for each selling function; and (3) the documentation provided to support the intensity level for each selling function and category. Based on that information, we find that Hyundai is unable to provide the necessary evidence from its books and records to support its methodology in reporting intensity levels. As such, we cannot determine that Hyundai's home market operates at a more advanced stage as its U.S. sales, and a CEP offset is not warranted.

**Comment 2:  Husteel's CEP Offset**

*Wheatland's Comments*[41]

- Husteel does not support its claim that the difference it identified in selling activities between home and U.S markets directly impacts price comparability, or its conclusion that the presence of LOT differences automatically necessitates an impact on price comparability.

- The analysis Husteel provided fails to support any actual selling activities. There is no link between the ISE cost categories used as the basis for calculating the intensity across the various selling activities.

- Husteel's adjustment to account for varying market sizes is flawed and fails to address Commerce's previous concern. Commerce's finding in the Draft Results of Redetermination that Husteel's U.S. sales require a higher intensity of selling activities than the home market is correct, and no CEP offset is justified.

---

[41] *See* Wheatland Comments at 13-15.

*Husteel's Comments*[42]

- Commerce incorrectly adjusted Husteel's reported expense intensities during the per-unit analysis, resulting in a lower expense per-unit values for home market sales than for CEP sales, implying the home market is not at a more advanced LOT.
- Commerce double-counted its market size adjustment of ISEs, as the data supplied to Commerce by Husteel was already adjusted for market size based on value. Commerce further adjusted the received data based on sale quantity, resulting in overstated per-unit U.S. sales expenses.

**Commerce's Position:** Husteel reported a single channel of distribution in the home market and in the United States. Husteel reported that it performed selling functions in all channels of distributions under each of these sales activity categories: (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales related administrative activities. Husteel based its quantitative method on the amount spent on each selling activity relative to the total domestic ISE and U.S. ISE (adjusted based on sales value in the market) to determine intensities of the different selling functions. For all channels of trade, Husteel reported intensities for these functions on a scale from zero to 10. Section 351.401(b)(1) of Commerce's regulations states that "{t}he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment." After reviewing the parties' comments, we find Husteel's methodology to adjust for differences in the domestic and U.S. markets to be flawed and that the U.S. market operates

---

[42] *See* Husteel Comments at 1-3.

at a more advanced level than that of the domestic market. Furthermore, like Hyundai, there are a number of faults with Husteel's supporting documentation, and, thus, we did not grant a CEP offset.

As an initial point, we agree with Wheatland that there are flaws in the documentation provided by Husteel that claims to substantiate the intensity of selling activities and linking them to cost categories. In the remand supplemental questionnaire, Husteel was specifically instructed to either show where on the record documentation demonstrates the specific selling functions undertaken by Husteel and Husteel USA Inc. performed during the POR, or to provide additional relevant documentation as necessary for each sales activity and selling function.[43] Husteel pointed to Exhibit A-10-B in the initial section A questionnaire response, consisting of sales forecasting, and strategic and economic planning reports. However, these reports neither link to the reported ISE nor explain or support how Husteel determined which selling functions corresponded to each selling activity category.[44]

Regarding our calculation of Husteel's per-unit analysis, we agree with Husteel that the data they provided did include an adjustment, based on value, to account for the differences in the size between the domestic and U.S. sales markets. However, we find that this adjustment is inappropriate because it does not properly calculate the different levels of intensity across various selling functions. Husteel calculated the ratio between domestic sales and U.S. sales and then applied that ratio to domestic ISE to calculate U.S. ISE.[45] In doing so, Husteel has not provided the actual levels of intensity for the U.S. market and has understated the level. We agree with Wheatland that the correct manner in calculating the levels of intensity is to calculate

---

[43] *See* Husteel Remand SQR at 1.
[44] *Id.* at 1-2; *see also* Husteel Section AQR at Exhibit A-10-B.
[45] *See* Husteel Remand SQR at 4-5.

the ratio between the specific selling function expense amount and the total domestic and U.S. ISE amounts, respectively. Our revised per-unit selling expense intensity analysis determines Husteel's home market sales to be at a different and less advanced stage of distribution than its U.S. sales.[46] Section 773(a)(7)(B) of the Act provides that a CEP offset may only be granted "when normal value is established at a level of trade which constitutes a more advanced state of distribution that the level of trade of the constructed export price." Accordingly, pursuant to 19 CFR 351.412(f)(ii) and section 773(a)(7)(B) of the Act, we determine that a CEP offset is not warranted.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the *Remand Order*, Commerce recalculated the weighted-average dumping margins for the respondents without a CEP offset. Accordingly, the revised weighted-average dumping margins for these companies are listed in the chart below.

| Producer/Exporter | *Final Results* Weighted-Average Dumping Margin (percent) | Remand Weighted-Average Dumping Margin (percent) |
|---|---|---|
| Hyundai Steel | 4.07 | 4.95 |
| Husteel | 1.97 | 2.42 |
| NEXTEEL | 3.21 | 3.91 |
| Seah Steel Corporation | 3.21 | 3.91 |

Upon a final and conclusive decision in this litigation, Commerce will instruct U.S. Customs and Border Protection to liquidate appropriate entries covered by the injunction signed on June 28, 2022, for the November 1, 2019, through October 31, 2020 PO,R consistent with these final results of redetermination. Because the weighted-average dumping margins are

---

[46] *See* Memorandum, "Final Remand Results Calculation for Husteel Co., Ltd.," dated concurrently with these final results of redetermination.

different than those in the *Final Results,* we intend to issue a *Timken Notice* with amended final results of review should the Court sustain these final results of redetermination.

10/30/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

16