Slip Op. 25-5

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **WHEATLAND TUBE**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES**, | **Before: Timothy M. Reif, Judge** |
| Defendant, | **Court No. 22-00160** |
| and | |
| **HYUNDAI STEEL COMPANY; HUSTEEL CO., LTD.; SEAH STEEL CORPORATION; NEXTEEL CO., LTD.**, | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Sustaining Commerce's final remand redetermination.]

Dated: January 15, 2025

Nicholas J. Birch, Schagrin Associates, of Washington, D.C., argued for plaintiff Wheatland Tube. With him on the briefs were Roger B. Schagrin and Elizabeth J. Drake.

Robert R. Kiepura, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. With him on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director and Franklin E. White, Jr., Assistant Director. Of counsel was JonZachary Forbes, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C., argued for defendant-intervenor Hyundai Steel Company. With him on the briefs was Robert G. Gosselink.

Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., argued for defendant-intervenor NEXTEEL Co., Ltd.  With him on the briefs were J. David Park, Daniel R. Wilson and Henry D. Almond.

Eugene Degnan, Morris, Manning & Martin LLP, of Washington, D.C., argued for defendant-intervenor Husteel Co., Ltd.  With him on the briefs were Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Jordan L. Fleischer, Nicholas C. Duffey and Edward J. Thomas III.

* * *

Reif, Judge:  Before the court are the remand results of the U.S. Department of Commerce ("Commerce") pursuant to the Court's order in *Wheatland Tube v. United States* ("*Wheatland Tube I*" or the "Remand Order"), 47 CIT __, __, 650 F. Supp. 3d 1379 (2023).  *See* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 61.

In *Wheatland Tube I*, the Court remanded for reconsideration Commerce's determination to grant a constructed export price ("CEP") offset to Hyundai Steel Company ("Hyundai") and Husteel Co., Ltd. ("Husteel") (collectively, the "mandatory respondents") in Commerce's 2019-2020 administrative review of the antidumping duty ("AD") order on circular welded non-alloy steel pipe from the Republic of Korea.  *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020* ("Final Results"), 87 Fed. Reg. 26,343 (Dep't of Commerce May 4, 2022) and accompanying Issues and Decision Memorandum ("IDM") (Dep't of Commerce Apr. 26, 2022).

The Court ordered Commerce to comply with its "obligations set forth in 19 U.S.C. § 1677m(d) — namely, to provide the mandatory respondents with: (1) notice of the 'nature' of any deficiencies that Commerce identified in their respective submissions; and (2) 'to the extent practicable . . . an opportunity to remedy or explain the deficienc[ies].'" *Wheatland Tube I*, 47 CIT at __, 650 F. Supp. 3d at 1383.

On remand, Commerce found that neither mandatory respondent demonstrated adequately that home market sales during the period of review ("POR") were at a more advanced level of trade ("LOT") than the CEP LOT. Remand Results at 6. Therefore, Commerce recalculated the weighted-average dumping margins for respondents without a CEP offset. *Id.* at 15.

For the reasons discussed below, the court sustains the Remand Results.

## BACKGROUND

The court presumes familiarity with the facts, as set out in *Wheatland Tube I*, and recounts only those facts relevant to the issues before the court on remand. In its decision of August 3, 2023, the Court addressed whether Commerce had complied with its obligations set forth in 19 U.S.C. § 1677m(d) to notify the mandatory respondents of deficiencies in their submissions and to provide respondents with an opportunity to remedy any deficiency by submitting a supplemental questionnaire response. *See Wheatland Tube I*, 47 CIT at __, 650 F. Supp. 3d at 1382-83.

In the Final Results, Commerce conceded that it had failed to comply with 19 U.S.C. § 1677m(d) and therefore granted each respondent a requested CEP offset, despite finding that neither respondent had provided an adequate quantitative analysis

supporting an offset.  *Id.* at __, 650 F. Supp. 3d at 1380-81.  The Court remanded

Commerce's decision in the Final Results to grant a CEP offset to the mandatory

respondents and ordered Commerce on remand to comply with 19 U.S.C. § 1677m(d),

"namely, to provide the mandatory respondents with: (1) notice of the 'nature' of any

deficiencies that Commerce identified in their respective submissions; and (2) 'to the

extent practicable . . . an opportunity to remedy or explain the deficienc[ies].'"  *Id.* at __,

650 F. Supp. 3d at 1383.

On August 24, 2023, Commerce issued a supplemental questionnaire to each

mandatory respondent, identifying deficiencies in their respective original questionnaires

and requesting further information regarding their respective LOT analyses.  *See*

Commerce Supplemental Questionnaire to Husteel (Aug. 24, 2023) ("Husteel Supp.

Quest."), REM-PR 1; Commerce Supplemental Questionnaire to Hyundai Steel (Aug.

24, 2023) ("Hyundai Supp. Quest."), REM-PR 2.

Respondents then submitted timely supplemental responses to Commerce.  *See*

Hyundai Steel's Remand Supplemental Questionnaire Response (Sept. 7, 2023)

("Hyundai SQR"), REM-CR 2, REM-PR 7; Husteel's Remand Supplemental

Questionnaire Response (Sept. 8, 2023) ("Husteel SQR"), REM-CR 4, REM-PR 8.

On October 31, 2023, Commerce issued its Remand Results, denying CEP

offsets to both respondents.  Remand Results at 15.

On December 11, 2023, the mandatory respondents filed comments in

opposition to the Remand Results.  *See* Husteel Comments on Commerce's Final

Remand Results ("Husteel Br."), ECF Nos. 68-69; Hyundai Comments on Commerce's

Final Remand Results ("Hyundai Br."), ECF Nos. 70-71.

On January 22, 2024, defendant United States (the "Government") and plaintiff

Wheatland Tube filed comments in support of the Remand Results.  *See* Def.

Comments Supporting Remand Results ("Def. Br."), ECF No. 73; Pl. Comments

Supporting Remand Results ("Pl. Br."), ECF No. 74.

On November 14, 2024, the court heard oral argument.  *See* Oral Arg. Tr., ECF

No. 82.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

On remand, the Court will sustain Commerce's determinations "if they are in

accordance with the remand order, are supported by substantial evidence, and are

otherwise in accordance with law."  *MacLean-Fogg Co. v. United States*, 39 CIT __, __,

100 F. Supp. 3d 1349, 1355 (2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see Prime*

*Time Com. LLC v. United States*, 45 CIT __, __, 495 F. Supp. 3d 1308, 1313 (2021)

("The results of a redetermination pursuant to court remand are also reviewed 'for

compliance with the court's remand order.'") (quoting *Xinjiamei Furniture (Zhangzhou)*

*Co. v. United States*, 38 CIT 189, 190, 968 F. Supp. 2d 1255, 1259 (2014)), *aff'd*, 2022

WL 2313968 (Fed. Cir. June 28, 2022); *see also Jiangsu Zhongji Lamination Materials*

*Co., (HK) v. United States*, 44 CIT __, __, 435 F. Supp. 3d 1273, 1276 (2020) (quoting

*Xinjiamei Furniture*, 38 CIT at 190, 968 F. Supp. 2d at 1259).

Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but it requires "more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  Moreover, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* at 488.

For a reviewing court to "fulfill [its] obligation" to decide whether a determination of Commerce is supported by substantial evidence and in accordance with law, Commerce is required to "examine the record and articulate a *satisfactory explanation* for its action." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (emphasis supplied) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

Further, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) (citing *Heveafil Sdn. Bhd. v. United States*, 25 CIT 147, 149 (2001)), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

"[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

**LEGAL FRAMEWORK**

Pursuant to 19 U.S.C. § 1673, Commerce is required to impose antidumping duties on foreign merchandise if: (1) Commerce determines that such merchandise "is being, or is likely to be, sold in the United States at less than its fair value" and (2) the U.S. International Trade Commission determines that the sale of such merchandise at less than fair value "materially injures, threatens, or impedes the establishment of an industry in the United States." *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1306 (Fed. Cir. 2017) (citing 19 U.S.C. § 1673).

The Federal Circuit has stated that merchandise is sold at "less than fair value" if "the normal value (the price a producer charges in its home market)" of such merchandise exceeds "the export price (the price of the product in the United States) or *constructed export price*" for the merchandise. *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013) (emphasis supplied) (quoting *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010)) (internal quotation marks omitted); *see* 19 U.S.C. § 1673.

19 U.S.C. § 1677a(b) provides that "[t]he term 'constructed export price' means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." Further, "where a sale is made by a foreign producer or exporter to an *affiliated* purchaser in the United States, the statute provides for use of [the] CEP as the [U.S.] price for purposes of the

comparison" with normal value.  *Micron Tech., Inc. v. United States*, 243 F.3d 1301,

1303 (Fed. Cir. 2001).

 19 U.S.C. § 1677b(a) provides that "[i]n determining . . . whether subject

merchandise is being, or is likely to be, sold at less than fair value, *a fair comparison*

shall be made between the [CEP] and normal value."  (emphasis supplied).  To conduct

a "fair comparison," Commerce is required in its LOT analysis to determine whether to

apply one of "two types of adjustments to normal value based on differences in the level

of trade."  *Dong-A Steel Co. v. United States*, 42 CIT __, __, 337 F. Supp. 3d 1356,

1374 (2018).  "The first type is a [LOT] adjustment . . . and the second type is a [CEP]

offset."  *Id.* (first citing 19 U.S.C. § 1677b(a)(7)(A); and then citing § 1677b(a)(7)(B)).

 Commerce regulations provide that "[i]n comparing United States sales with

foreign market sales, [Commerce] may determine that sales in the two markets were not

made at the same level of trade, and that the difference has an effect on the

comparability of the prices.  [Commerce] is authorized to adjust normal value to account

for such a difference."  19 C.F.R. § 351.412(a).  Further, "sales are made at different

levels of trade if they are made at different marketing stages (or their equivalent)," and

"[s]ubstantial differences in selling activities are a necessary, but not sufficient, condition

for determining that there is a difference in the stage of marketing."  *Id.* § 351.412(c)(2).

 Pursuant to 19 U.S.C. § 1677b(a)(7)(A), Commerce is required to "make due

allowance for any difference (or lack thereof) between the [CEP] and [normal value] that

is shown to be wholly or partly due to a difference in level of trade between the [CEP]

and normal value, if the difference in level of trade — (i) involves the performance of

different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined."

Pursuant to § 1677b(a)(7)(B), Commerce is required to grant a CEP offset "[w]hen normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the [CEP], but the data available do not provide an appropriate basis" to grant a LOT adjustment.  *See Dong-A Steel Co. v. United States*, 44 CIT __, __, 475 F. Supp. 3d 1317, 1325 (2020).  In granting a CEP offset, Commerce reduces the normal value of the subject merchandise "by the amount of indirect selling expenses [("ISE")] incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made."  19 U.S.C. § 1677b(a)(7)(B).

With respect to the decision to grant a CEP offset, "it is the responsibility of the respondent requesting the CEP offset to procure and present the relevant evidence to Commerce."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 CIT 533, 556, 616 F. Supp. 2d 1354, 1374 (2009); *see* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 829-30 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4167-68 ("[I]f a respondent claims an adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment.").

Further, the decision to grant a CEP offset is not "automatic," and the "burden of proof is upon the claimant to prove entitlement" to such an offset.  *Corus Eng'g Steels*

*Ltd. v. United States*, 27 CIT 1286, 1290 (2003) (citing *Micron Tech.*, 243 F.3d at 1315-16); *see also* 19 C.F.R. § 351.401(b)(1) ("The interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment . . . .").

Commerce has stated previously that it requires "adequate documentation" that includes both a "qualitative" and "quantitative" analysis to "find that a LOT adjustment and/or CEP offset is [] warranted." *Certain Frozen Warmwater Shrimp from Thailand: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 Fed. Reg. 69 (Dep't of Commerce Jan. 3, 2022) and accompanying IDM (Dep't of Commerce Dec. 23, 2021) at cmt. 2.

Commerce has explained that this requirement "enable[s] Commerce to determine whether . . . sales were made at different LOTs" and, consequently, to decide whether to provide a respondent with an adjustment to the normal value of its merchandise. *Id.*

With respect to qualitative evidence, Commerce evaluates information that a respondent may provide such as "narrative descriptions of differences in selling functions, customer correspondence, sample sales records [and] meeting presentations." *Id.*

However, Commerce has stated that "[a]lthough [such] information . . . is helpful and relevant to [Commerce's] LOT analysis, reliance on this information alone limits Commerce's ability to analyze selling functions to determine if LOTs identified by a party have meaningful differences and to evaluate whether a respondent's [LOT] claims are

reasonable and accurate." *Id.* Additionally, "reliance on purely qualitative information may create the potential for manipulation (or inaccurate reporting) by permitting respondents to create a narrative that is not linked in any way to its verifiable financial data." *Id.* Accordingly, "[s]ince 2018, Commerce has required respondents to provide *quantitative* evidence in support of their LOT claims" to "present a complete understanding of a respondent's selling activities." *Id.* (emphasis supplied).

Commerce has stated that "quantitative evidence in support of thorough explanations of the differences in LOTs and the identified selling functions enhances [Commerce's] LOT analysis because such information allows [Commerce] to determine whether differences in prices among various customer categories or differences in levels of expenses in different claimed LOTs are, in fact, attributable to differences in LOTs or to an unrelated factor, such as relative sales volumes." *Id.* Further, such quantitative evidence "reduces subjectivity and the likelihood of inconsistency in the application of Commerce's analytical framework that may result from the analysis of purely qualitative information, which can be, by its nature, subject to different interpretations." *Id.*

## DISCUSSION

### I.    Whether Commerce complied with the Remand Order and satisfied its obligations under 19 U.S.C. § 1677m(d)

The court addresses first whether Commerce complied with the Remand Order and satisfied Commerce's obligations under 19 U.S.C. § 1677m(d). For the below reasons, the court concludes that Commerce's supplemental questionnaires complied

with the Remand Order and satisfied Commerce's obligations under 19 U.S.C. §

1677m(d).

### A.    Positions of the parties

Hyundai argues that Commerce did not satisfy its obligations under § 1677m(d)

and, therefore, failed to comply with the court's Remand Order.[1]  Hyundai Br. at 2.

Hyundai argues that Commerce's supplemental questionnaire did not notify Hyundai of

the "nature" of any deficiencies in Hyundai's original submissions made during the

course of the underlying administrative review.  *Id.*

Hyundai argues further that Commerce "simply requested further information to

which Hyundai Steel provided a complete response."  *Id.*  Hyundai claims that, as a

result, it was denied "a meaningful opportunity to 'remedy or explain' in its supplemental

questionnaire response."  *Id.*

Hyundai claims also that Commerce was required by 19 U.S.C. § 1677m(d) to

notify Hyundai of "any concerns in [Hyundai's] quantitative analysis presented in

advance of issuing a draft of the remand redetermination," something that Commerce

did not do.  *Id.* at 7.

The Government argues that Commerce did comply with the Court's Remand

Order when Commerce issued supplemental questionnaires to both respondents on

remand.  Def. Br. at 5.  The Government argues that the supplemental questionnaires

"specifically identified the nature of deficiencies of each respondents [sic] respective

---

[1] Husteel does not make an equivalent argument with respect to the supplemental
questionnaire it received from Commerce.  *See* Husteel Br.

prior submissions and provided an opportunity for both respondents to remedy or explain such deficiencies." *Id.*

Specifically, the Government notes that its supplemental questionnaire to Hyundai requested "documentation that Hyundai Steel and its affiliates performed the reported selling functions, a quantitative analysis showing how the expenses assigned to period of review sales made at different claimed levels of trade impact price comparability, and a demonstration of how indirect selling expenses vary by the different claimed levels of trade." *Id.* at 6. Last, the Government argues that the court should reject Hyundai's argument that Commerce was required under § 1677m(d) to provide Hyundai with an additional opportunity to correct its supplemental responses. *Id.* at 7.

**B.    Analysis**

The court concludes that Commerce's supplemental questionnaires complied with the Remand Order and satisfied Commerce's obligations under § 1677m(d). Section 1677m(d) provides that upon "determin[ing] that a response to a request for information . . . does not comply with the request," Commerce "shall *promptly inform* the person submitting the response of the nature of the deficiency and shall, *to the extent practicable*, provide that person with an *opportunity to remedy or explain the deficiency*." (emphases supplied).

Hyundai does not assert that Commerce's supplemental questionnaire was not timely, only that Commerce failed to specify the nature of the deficiencies in Hyundai's

original submissions.  *See* Hyundai Br. at 2.  The court concludes that Commerce adequately informed Hyundai of the deficiencies in Hyundai's original submissions.

First, Hyundai cannot claim that it was not made aware of the deficiencies in its original submissions.  From Commerce's discussion in the Final Results, and from this Court's discussion thereof in the Remand Order, Hyundai was alerted to the deficiencies in its original submissions.

In the Final Results, Commerce found that "the quantitative analyses provided by the respondents was inadequate in response to Commerce's initial questionnaire."  IDM at 13.  Specifically, Commerce stated that neither mandatory respondent had provided an adequate quantitative analysis "showing how the expenses assigned to the POR sales made at different claimed LOTs impact[ed] price comparability [or] how the quantitative analysis support[ed] the claimed levels of intensity for the selling activities reported in the selling functions chart."  *Id.*

Notwithstanding these deficiencies, Commerce conceded that it had failed to "inform the [mandatory] respondents that [Commerce] required more information" in their respective submissions, which resulted in neither mandatory respondent "ha[ving] an opportunity, pursuant to [§ 1677m(d)], to remedy any deficiency in their quantitative analyses by providing additional information in a supplemental questionnaire response."[2]  *Id.* at 13-14.  In sum, Hyundai was alerted to the nature of the deficiencies

---

[2] Commerce's discussion of respondents' deficient submissions is repeated and summarized in the Remand Order.  *See Wheatland Tube I*, 47 CIT __, __, 650 F. Supp. 3d 1379, 1381 (2023).

in its original submissions, even prior to receiving Commerce's supplemental questionnaire.

Second, Commerce's supplemental questionnaire to Hyundai adequately reiterated these deficiencies and specifically identified the information Hyundai needed to submit to correct such deficiencies.  In its cover letter to Hyundai's supplemental questionnaire, Commerce informed Hyundai that Commerce "identified several areas in Hyundai Steel's section A of its initial questionnaire response for which [Commerce] require[d] further information as specified" in the supplemental questionnaire.  Hyundai Supp. Quest. at 1.  In addition, Commerce noted that it would "not be issuing another supplemental questionnaire after this one."  *Id.*

Commerce's supplemental questionnaire to Hyundai explicitly referenced specific exhibits from Hyundai's original submissions and specified information that Commerce deemed missing from those exhibits.  *See, e.g.*, *id.* at 2 ("Add a column to Exhibit A-13-A which provides the citations to the relevant documentation demonstrating that Hyundai Steel . . . performed the selling activities listed in the selling functions chart.").

Further, Commerce's supplemental requests plainly sought clarification of the deficiencies identified by Commerce in the Final Results, deficiencies to which Hyundai was already alerted.  *Compare, e.g.*, *id.* at 2 ("Please provide a quantitative analysis showing how the expenses assigned to POR sales made at different claimed [LOTs] impact price comparability."), *with* IDM at 13 ("Neither respondent provided an analysis showing how expenses assigned to sales at different claimed LOTs impacted price comparability.").

The Federal Circuit has held that Commerce "satisfie[s] its obligations under section 1677m(d) when it issue[s] a supplemental questionnaire specifically pointing out and requesting clarification of [a respondent's] deficient responses." *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007); *see also Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (holding that Commerce satisfied its obligation under section 1677m(d) when the respondent "failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified [the respondent] of that defect"). Following the Federal Circuit's guidance, the court concludes that Commerce's supplemental questionnaire to Hyundai satisfied its obligations under § 1677m(d).[3]

Hyundai makes the additional argument that Commerce was obligated under § 1677m(d) to notify Hyundai of any flaws in the quantitative analysis Hyundai submitted as part of its supplemental response. Hyundai Br. at 6-7. Hyundai notes that it requested in its supplemental response that Commerce "notify and provide guidance" should Commerce disagree with Hyundai's quantitative analysis, "so that Hyundai Steel has the opportunity to demonstrate that [Commerce] should continue to grant a CEP offset, as required by 19 U.S.C. § 1677m(d)." Hyundai SQR at RS-11.

Hyundai's argument misunderstands the requirements of § 1677m(d). In the Remand Results, Commerce did not find that Hyundai failed to comply with

---

[3] Husteel does not challenge Commerce's compliance with 19 U.S.C. § 1677m(d), but the court concludes that Commerce satisfied its obligations with respect to Husteel for the same foregoing reasons.

Commerce's request, as is the definition of a deficient submission under the statute. *See* 19 U.S.C. § 1677m(d) (stating that a submission is deficient if Commerce "determines that a response to a request . . . does not comply with the request"). Rather, Commerce determined merely that Hyundai's quantitative analysis did not allow Commerce to "find home market sales at a different LOT and more advanced stage of distribution than the CEP LOT." Remand Results at 6.

What Hyundai seeks is the opportunity to amend its quantitative analysis in a manner more to Commerce's liking, with the benefit of having Commerce's reasoning in the Remand Results before it. Section 1677m(d) provides for no such opportunity. *See ABB Inc. v. United States*, 42 CIT __, __, 355 F. Supp. 3d 1206, 1222 (2018) ("Commerce is not obligated to issue a supplemental questionnaire to the effect of, 'Are you sure?'").

Further, the burden "falls to the party seeking the CEP offset to provide the requisite evidence that would allow Commerce to determine that a CEP offset adjustment is warranted." *Dong-A Steel*, 44 CIT at __, 475 F. Supp. 3d at 1347 n.22. "That Commerce did not request any additional information beyond what was provided by [Hyundai] does not discredit the validity of the conclusion drawn from that evidence." *Id.* Commerce is not obligated under § 1677m(d) "to work with [Hyundai] to correct . . . the record [where] the fundamental difference in conclusions reached by [Hyundai] and Commerce derived . . . from differing yet equally reasonable interpretations of the evidence." *Id.*

In sum, the court concludes that Commerce fully met its obligations under §

1677m(d).

## II.    Whether Commerce's Remand Results are supported by substantial evidence

The court now turns to the mandatory respondents' challenge to Commerce's

denial of CEP offsets to both mandatory respondents.  For the below reasons, the court

concludes that Commerce's denial of a CEP offset to both mandatory respondents was

reasonable and supported by substantial evidence.

### A.    Positions of the parties

#### 1.    Commerce's denial of a CEP offset to Hyundai

Hyundai argues that Commerce's denial of a CEP offset is unreasonable and

unsupported by substantial evidence.  Hyundai asserts that Commerce's methodology

was "mathematically invalid" because Commerce "divided the specific reported level of

intensity by the quantity sold in the home market [("HM")] . . . and did the same for

Hyundai Steel's U.S. sales."  Hyundai Br. at 8.  Hyundai argues further that

"Commerce's error in dividing intensity levels by particular market sales totals"

"disregards entirely that [Hyundai] reported its levels of intensity on a per-sale basis and

not cumulatively for all sales made in each market."  *Id.*

In response, the Government argues that "Commerce reasonably determined

that it [was] necessary to account for and eliminate the distortion created by the

differences in the sizes between the home market and U.S. market."  Def. Br. at 13.

According to the Government, "Commerce reasonably explained that . . . relying on

values for total expenses or number of employees without considering the relative sizes of the two markets . . . does not reflect the fact that the home market is significantly greater than the U.S. market, and is therefore distortive." *Id.* (citing Remand Results at 10-11). Additionally, the Government argues that "Commerce reasonably found that Hyundai Steel did not provide any evidence from its books and records that ties the number of employees to specific individual selling functions in the different channels of distribution." *Id.* at 10.

Hyundai argues also that Commerce erred in using in its calculations "only U.S. sales of subject merchandise to [Hyundai's] U.S. affiliates where the levels of intensity were based on company-wide exports that include exports to countries other than the U.S. market." Hyundai Br. at 9. According to Hyundai, this error resulted in Commerce "vastly overstat[ing] the per-unit selling expense intensity for the CEP LOT for the majority of the reported selling functions." *Id.*

In response, plaintiff argues that Commerce was correct in using only U.S. sales in its calculations because such sales are "the only export sales that matter in this analysis." Pl. Br. at 7.

Hyundai's final argument is that Commerce failed to consider the qualitative record information previously cited to in Commerce's original preliminary determination. Hyundai Br. at 10. Hyundai asserts that this qualitative evidence supports the conclusion that Hyundai's home market LOT was "at a more advanced distribution stage than the CEP LOT." *Id.*

In response, the Government argues that Commerce did examine the qualitative record information but that, nevertheless, Commerce "reasonably explained that under its current methodology [Commerce] requires a quantitative analysis supported by demonstrative company records or other documentation to warrant the granting of an offset."  Def. Br. at 14.  Plaintiff adds that even if Hyundai's qualitative evidence was "sufficient," Commerce still "properly rejected Hyundai Steel's quantitative claims and so properly found [that] Hyundai Steel failed to meet its burden to qualify for a CEP offset." Pl. Br. at 16-17.

### 2.    Commerce's denial of a CEP offset to Husteel

Husteel argues that Commerce's denial of a CEP offset is contrary to the record. Husteel claims that "Commerce's multiple attempts to manipulate the data in [Commerce's] per-unit analysis . . . are results driven and mathematically incorrect." Husteel Br. at 3.  Husteel insists that Commerce's methodology "resulted in a double adjustment for market size and a distorted quantitative analysis."  *Id.* at 6.

Husteel argues that its quantitative analysis already properly adjusted for market size differences and demonstrated that Husteel's home market selling expenses "are much higher than [its] US sales expenses on a per-unit basis."  *Id.* at 7.  Husteel asserts that Commerce erred in "examin[ing] the intensities in each market in isolation" when Commerce "compare[d] the selling activity ISE in the HM as a percent of its total ISE, and those of the US market as a percentage of the total in that market, with no adjustment to allow a comparison between the two markets."  *Id.* at 9.  Husteel argues further that the correct comparison is "the expense to Husteel to sell in each market

relative to the other market," specifically "what the expense is to Husteel in the US market, relative to the HM." *Id.*

The Government argues that Commerce "was reasonable in finding Husteel's analysis insufficient" because "Husteel did not divide its U.S. indirect selling expense accounts by its total U.S. indirect selling expense amount, but instead divided by a derived figure from its home market indirect selling expense amount," which "did not reflect the actual levels of intensity for the U.S. market and understated the value." Def. Br. at 15-16. Plaintiff adds that "Commerce's decision to apply the same calculation methodology to both [Husteel's home and U.S.] markets in order to compare consistent figures was reasonable." Pl. Br. at 18. Plaintiff argues that both respondents "seek to have the Court substitute [their] preferred weighing of the evidence for how Commerce weighted that evidence." *Id.* at 17. Plaintiff argues further that respondents merely "disagree[] about the methodology the agency found appropriate to apply." *Id.* at 12. Therefore, plaintiff asserts that respondents have failed to provide the court "with any meaningful reason to disturb" Commerce's Remand Results. *Id.* at 11.

**B.    Analysis**

The court concludes that Commerce's denial of a CEP offset to both respondents was reasonable and supported by substantial evidence.

As an initial matter, both the statute, 19 U.S.C. § 1677b(a)(7)(B), and Commerce's regulations, 19 C.F.R. § 351.412, provide limited direction as to the methodology Commerce is to use to analyze whether to grant a CEP offset. Section 1677b(a)(7)(B) provides that Commerce will grant a CEP offset when "normal value is

established at a level of trade which constitutes a more advanced stage of distribution

than the level of trade of the constructed export price, but the data available do not

provide an appropriate basis to determine . . . a level of trade adjustment."  However,

the statute is silent as to how exactly Commerce should analyze whether the normal

value LOT is more advanced than the CEP LOT.[4]

Commerce's own regulations provide that Commerce "will determine that sales

are made at different levels of trade if they are made at different marketing stages."  19

C.F.R. § 351.412(c)(2).  Commerce's regulations state also that "[s]ubstantial

differences in selling activities are a necessary, but not sufficient, condition for

determining that there is a difference in the stage of marketing."  *Id.*  Beyond these

general requirements, Commerce's regulations do not require Commerce to adhere to a

particular methodology when analyzing differences in marketing stages and selling

activities.

When analyzing whether to grant CEP offsets to the respondents, Commerce

found that neither respondent's quantitative analysis demonstrated that home market

sales were at a different and more advanced stage of distribution than U.S. sales.

Remand Results at 6.  With respect to Hyundai, Commerce explained that Hyundai's

analysis, which calculated intensities of different selling functions based on the number

of employees, did not "consider differences in the sizes between the two markets."  *Id.*

at 10.  Commerce explained also that Hyundai did not provide "any evidence from its

---

[4] Hyundai concedes that "the statute provides no guidance about the methods by which
Commerce should evaluate whether to grant a CEP offset."  Hyundai Br. at 4.

books and records that tie[d] the number of employees to specific individual selling

functions in the different channels of distribution." *Id.* at 11.  Commerce explained

further that Hyundai "used the same cost category as the basis of intensity for a variety

of selling functions and provided no information on the actual selling activities or how

the intensity was determined, beyond overall wage cost." *Id.*

 With respect to Husteel, Commerce explained similarly that there were faults in

Husteel's methodology, which analyzed "the amount spent on each selling activity

relative to the total domestic ISE and U.S. ISE (adjusted based on sales value in the

market) to determine intensities of the different selling functions," and Husteel's

supporting documentation. *Id.* at 13-14.  Commerce explained that Husteel provided

"sales forecasting, and strategic and economic planning reports" that "neither link[ed] to

the reported ISE nor explain[ed] or support[ed] how Husteel determined which selling

functions corresponded to each selling activity category." *Id.* at 14.  Commerce

explained further that Husteel's market size adjustment did not "properly calculate the

different levels of intensity across various selling functions" because "Husteel calculated

the ratio between domestic sales and U.S. sales and then applied that ratio to domestic

ISE to calculate U.S. ISE." *Id.*  Commerce explained that Husteel's methodology did not

provide "the actual levels of intensity for the U.S. market and . . . understated the level."

*Id.*

 Commerce found that both mandatory respondents' analyses were flawed.

Commerce concluded that it needed to "extend[] [those] analyses to also include a per-

unit analysis . . . based on . . . sales volume" to derive a valid comparison. *Id.* at 5.

Commerce's per-unit analysis in turn "establishe[d] that the home market LOT is not at a more advanced stage of distribution than the LOT of the CEP LOT of either respondent." *Id.* at 6.

The mandatory respondents argue that Commerce's methodology was unreasonable and unsupported by substantial evidence. Hyundai Br. at 8-9; Husteel Br. at 6, 9. Respondents' arguments are not persuasive. There is nothing in Commerce's choice of methodology for analyzing differences in selling activities that conflicts with the statutory or regulatory requirements. Given the minimal statutory and regulatory guidance, Commerce determined reasonably that a per-unit analysis was necessary to adjust for market size differences to compare more accurately differences in levels of trade between markets. Further, Commerce's analysis is supported by substantial evidence in the record.

This Court has previously held, in cases challenging antidumping determinations by Commerce, "that where the relevant statute provides little direction, 'Commerce enjoys discretion in choosing its methodology.'" *Al Ghurair Iron & Steel LLC v. United States*, 45 CIT __, __, 536 F. Supp. 3d 1357, 1374 (2021) (quoting *NSK Ltd. v. United States*, 29 CIT 1, 17, 358 F. Supp. 2d 1276, 1291 (2005), *aff'd*, 162 F. App'x 982 (Fed. Cir. 2006)), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023).

"Because [the statute] does not mandate the use of a particular formula, Commerce has the ability to choose how to calculate [differences in levels of trade] as long as its chosen methodology is reasonable and Commerce explains its choice." *Id.* Additionally, "Commerce is [not] required to use a party's proffered and preferred

methodology" so long as "Commerce used a reasonable formula that satisfies the statutory requirements." *Id.* at __, 536 F. Supp. 3d at 1374-75; *see also Dong-A Steel*, 42 CIT at __, 337 F. Supp. 3d at 1375 ("Commerce is not bound to a specific formula to determine whether to grant a constructed export price offset.").

Moreover, the Federal Circuit has recognized that Commerce is entitled to deference in administering the antidumping law. *Fujitsu Gen. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citing *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571, 1582 (Fed. Cir. 1983)).  This deference stems from the recognition that "[a]ntidumping . . . duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Id.* (citing *United States v. Zenith Radio Corp.*, 64 CCPA 130, 139, 562 F.2d 1209, 1216 (1977), *aff'd*, 437 U.S. 443 (1978)).

In sum, Commerce's determination in the Remand Results to deny a CEP offset to respondents was supported by substantial evidence and in accordance with law.

## CONCLUSION

For the foregoing reasons, Commerce's Remand Results are sustained. Judgment will enter accordingly.

/s/      Timothy M. Reif
Timothy M. Reif, Judge

Dated:      January 15, 2025
        New York, New York